SOPHIA GUNN, by her next friend, JOHN W. CARY, *vs.* ESTHER BLAIR, impleaded with GAYLORD BLAIR DEXTER G. CLARK, and JONATHAN WALLINGFORD, Appellants.

APPEAL FROM CIRCUIT COURT, WALWORTH COUNTY.

Heard October 14.]            [Decided October 25, 1859.

*Trusts—Discovery—Receiver—Debtor and Creditor.*

Where B. had invested the funds of G. in real estate, and then to defraud G. out of the funds, conveyed the lands to C., who conveyed to W., and W. conveyed to the wife of B.: held that B. holding only a trust interest in the estate, could convey no better title to his grantee with knowledge ; and that all the deeds were in fraud of the rights of G., and the trust remained in the hands of the wife of B., and the land in her hands must be charged with the trust.

Gunn vs. Blair.

In a suit by bill for discovery and to enforce a trust in lands, the court may, at its option, appoint a receiver of the lands, with authority to sell the same, to execute the trust, instead of driving the *cestui que trust* to a sale by execution.

A husband in embarrassed circumstances furnished the means to purchase lands in the name of his wife, the conveyance being given without consideration except from the husband, in fraud of the rights of his creditors, it enures in trust for their benefit, and will be held to answer for judgments against him.

This was a bill in chancery under the old practice. The bill stated that Sophia Gunn was the child and heir at law of Joel Blair, late of the state of New York, who died in February, 1839, leaving a last will which made provision for Sophia as follows:

" I give and bequeathe to my daughter Sophia, the wife of Reuben L. Gunn, the annual interest of one-sixth part of all the goods and chattels and credits in possession or in action, I may die seized of, during her natural life, the principal to be invested in permanent securities, and the interest paid to her annually by my executor. But the principal shall be so far at her disposal, that if she has no children, she, by her last will and testament, may bequeathe the same to any person or persons; and if not so bequeathed, after her decease, the principal shall be equally divided among her children, if any, if not, among my heirs and their legal representatives; and I do hereby appoint my son, Gaylord Blair, the sole executor of this my last will and testament."

The will was duly proved and letters testamentary issued to Gaylord Blair, who entered into possession of the property to the amount of between $18,000 and $20,000, of which Sophia was entitled to one-sixth part, and the one-fifth part of $1,000, by virtue of the will to be invested as aforesaid. Her sixth amounted to $3,177, which came to Blair in February, 1839, who has retained the same, not paying either principal or interest. That Sophia has no children living, and that Blair will squander the said sum unless compelled to invest the same in permanent securities. That her husband was insolvent, and would squander her estate if he could get hold of it. In June, 1844, she had commenced a suit against Blair in New York, in which Blair had appeared and contested, and a decree entered in that cause that Blair,

Vol. IX.	23

within ten days, pay to the clerk of the county of Monroe, as clerk of the court, the sum of $3,172 55, to be invested, &c., and to pay to her within the same time, $1,862 65, with interest on the sum of $5,039 20, from 1st of September, 1851, together with costs, &c., &c. That the costs were taxed at $390 83. Pending ·the suit in New York, Blair removed to the State of Wisconsin, taking all of said funds with him, where he purchased 445 74-100 acres of land in Walworth county, which he had ever since occupied as a farm and paid for the same out of the funds.

That in March, 1852, she had commenced a suit against him and Dexter G. Clark in equity, in Walworth county, by a bill setting forth the will, legacy, appointment of the executor, the receipt of the funds, and his refusal to invest, &c., and the proceedings and decree in said suit in New York. That the suit was dismissed against Clark without prejudice, and final decree passed against Blair, in October, 1853; that Blair was ordered in ten days to pay to the clerk of the court $3,172 55, to be invested, &c., and pay to the said Sophia $3,002 16, with interest on $6,174 71, with costs taxed at 46 01; that demand of payment had been made, and Blair had refused to pay, &c.; that executions were issued to enforce the decree, and delivered to the sheriff; that Blair has no personal estate out of which the amount of the executions could be made, and no property, save the lands he had purchased and occupied.

That to defraud Mrs. Gunn and to prevent her from collecting her legacy, &c., and to prevent the lands from being seized and applied in satisfaction of the executions, Blair had executed and delivered for a pretended consideration of $6,320 a deed of conveyance of all the lands to Dexter G. Clark, and had caused the same to be recorded, &c. But that Clark never acquired any real interest in the lands, and the conveyance was not for a valuable consideration, and if any thing was paid by Clark, it was refunded to him by Blair; that the notes and mortgage given by Clark for the purchase money, had not been paid but had been returned to Clark in some way, and he had never had the possession or the rents of the lands. That Blair had also procured Clark to convey the lands to Jonathan Wallingford, and that the only consideration was that Blair delivered up the notes and mortgages given by Clark to Blair; that Wallingford had no interest but a naked title for the benefit of Blair, his son-in-law, with whom he resided, and he was quite aged. That he had formerly resided in New York, afterwards in Michigan, and previously to

coming to reside with Blair he had no means of support or property of any kind. That as the lands were of the value of $10,000, Wallingford was entirely unable to purchase them. That Wallingford, on the 30th of April, 1853, conveyed the lands to Esther Blair, wife of Gaylord Blair, and the title still remains in her. That all the conveyances were fraudulent, and made to defraud Mrs. Gunn, and ought to be set aside.

The bill closed with several forms of prayer for relief, of which the following will be noticed : " That the said Gaylord Blair and Esther Blair, his wife, may be directed by a decree of this court to convey the said lands above described to a receiver, to be appointed by this honorable court, and that such receiver may be authorized to sell and convey said lands, and out of the proceeds arising from said sale or sales, pay the amount directed by said decree so as aforesaid entered in the circuit court in equity for Walworth county, to be paid to the said Sophia Gunn, with interest thereon, and all costs by her incurred in the prosecution of her said suit in the said circuit court in equity, together with the costs of this suit, may be paid to her, and that the sum therein directed to be invested for her use, be paid to the clerk of the circuit court for the county of Walworth, to be invested in permanent securities, and the interest to be paid over annually to the said Sophia Gunn, according to the provisions of the said decree."

The bill was under oath and required to be answered under oath. The answer of Gaylord Blair, denied that he had received the property of the plaintiff except in her own notes and mortgages given to her father during his lifetime ; and therefore denied that he had ever had any moneys in his hands belonging to her ; also denied that he had invested the same in the lands described in the bill. But admits all the averments of the bill, except the charges of fraud in making the conveyances to Clark and Wallingford.

Esther Blair answered that the deed from Wallingford to her was made by him for the consideration of love and affection, and for the support of her father during his natural life. Denied that the conveyance was made to cheat and defraud the plaintiff, and also all knowledge of any right of the plaintiff in the premises, or against Gaylord Blair. It also set up that the conveyance from Clark to Wallingford was made upon a *bona fide* consideration, paid by Wallingford to Clark, out of his own means.

Wallingford and Clark also answered denying the fraud on

their part, and asserting the *bona fides* of the conveyances to them respectively.

The plaintiff upon the trial took the testimony of the defendant Wallingford, but his and the testimony of the other witnesses, together with the other facts of the case, are noticed in the opinion of the court.

Upon the final hearing the circuit court ordered a decree declaring all the several conveyances stated in the complainant's bill to be fraudulent and void, and appointed a receiver to sell and dispose of the premises, or so much as was necessary, and out of the proceeds to pay and satisfy the decree of the court before made in favor of the complainant against Gaylord Blair, with the costs, and also the costs of this suit and subsequent proceedings. Also letting the receiver into possession of the premises.

From that order the defendant, Esther Blair, took an appeal to this court.

*J. W. Cary,* for the respondent.

*J. E. Arnold and M. H. Carpenter,* for the appellant.

*By the Court,* COLE, J. In this case the circuit court decided that the conveyance made by Gaylord Blair to Dexter G. Clark, on the 12th day of October, 1849, was fraudulent and void, as to the respondent, but as it does not appear that Clark is dissatisfied with this decision ; or at all events, has not appealed from the judgment, we are relieved from any critical examination of the pleadings and proofs, to see whether they sustain the decision of the court upon that question or not. We may remark in passing that from our appreciation of the facts and circumstances, as described in the evidence, we see strong reasons to sustain the views of the circuit court upon this branch of the case ; and were we under the necessity of going into this inquiry, it is quite probable that we should also come to the conclusion that that deed was not made, *bona fide,* and for a valuable consideration ; but really in trust for the grantor, Gaylord Blair.

We think it must be admitted that the circumstances go strongly to support such a presumption, but still it does not become necessary to decide that question; for since Esther Blair is the only party who has appealed, we have but to inquire whether she has any good reason to complain of the judgment. Now, assuming that the conveyance from Blair to Clark in 1849 was a valid conveyance, made in good faith, still it is apparent that if Clark subsequently conveyed the property to Wallingford at the procurement of Gaylord Blair, Blair furnishing the consideration, and being in fact the real owner, that then the deed from Wallingford to the appellant, not being executed for any valuable consideration, but only from love and affection, must be held to be fraudulent as to her husband's creditors. On the contrary should it appear that Wallingford paid for the property out of his own means, and that there was no fraud in the conveyance from Clark to him, then unquestionably he would have the right to convey the property to his daughter for the consideration expressed, and a court of equity would sustain such a transaction. We must therefore, in the first instance, determine whether the purchase made by Wallingford from Clark, was really the purchase of Gaylord Blair, paid for with his means and upon trust for his benefit? And upon this point we think the testimony shows most clearly and satisfactorily that it was.

Wallingford in his answer, states in substance, that he purchased this property of Clark on or about the 18th of May, 1852, paying therefor in cash, $500, and interest upon that sum from the time Clark bought of Blair; and also delivering over to Clark the notes and mortgage which Clark had given to Gaylord Blair in October, 1849, to secure the unpaid purchase money to become due on Clark's purchase. Wallingford says that he bought these notes and mortgage of Blair in 1850, amounting to some $6,320, giving to Blair therefor his promissory note, which he paid during the years 1851–'2.

At the time of this purchase he says that he was worth about $4,000, being money in the hands of one of his sons. This answer being called for under oath was sworn to by Wallingford. The answers of Blair and wife, which were likewise under oath, gave substantially the same account of the time and manner of Wallingford's purchase. We shall not further notice them than to say that they entirely fail to convince our minds that Wallingford did buy, or ever possessed the means of buying of Blair, the Clark notes and mortgage, and paying therefor over six thousand dollars. Neither shall we stop to comment upon the answer of Wallingford in respect to this purchase and of the account he gives of his pecuniary responsibility at that time, for the purpose of showing how utterly irreconcilable and inconsistent his statements are in this particular with all the testimony in the case. It appears that at the time Wallingford put in this answer, he was a very old and infirm man, over eighty-five years of age, was a paralytic; and we think it is charitable and humane to suppose that he did not fully comprehend the scope and extent of his answer. He was also examined as a witness on behalf of the respondent, for the purpose of enabling him to disclose where he obtained the means to buy the Clark notes and mortgage. His testimony upon that point is confused, indistinct and unsatisfactory, and goes far to destroy any weight which his answer otherwise might have had. But from other testimony in the case we learn that he lived from 1825 to 1838 in Ontario county, New York; that about the latter year he removed from New York to Michigan, where he resided until about 1850, when he came to Wisconsin to reside with the family of Gaylord Blair. And it further appears from the evidence, that during all this time he was a poor man, had little or no property, and received more or less assistance from his relatives and children. Where then could he have obtained upwards of six thousand dollars, when more than eighty years

of age, with which to buy and pay for the Clark notes and mortgage? It is impossible to believe that he could have accumulated that amount of money as the savings of his labor, and kept it secret from his neighbors and relatives, so as to pass with them for a poor man. This is not pretended. Neither does it seem possible that Wallingford could have obtained such a sum from any person without being able to tell who it was.

But not to dwell upon this point, we will only add, that all the facts and circumstances of the case, in our judgment, lead irresistibly to one conclusion, that Blair furnished Wallingford with the notes and mortgage, and with whatever money was paid Clark for the property; and he had the deed made to Wallingford instead of taking the title himself, although he was the real owner. Consequently Blair having paid the consideration for the land, and being the real equitable owner thereof, could not place it beyond the reach of his creditors by having the title conveyed to Wallingford. And for a like reason the appellant paying nothing for the property, took it subject to these same equities, and has no ground of complaint because the circuit court set aside and annulled her deed.

It cannot reasonably be supposed that she was not in possession of ample and sufficient information respecting the circumstances of her father, and hence must have known that he had not paid for this property with his own means, but with the obligations and funds which her husband had furnished him; and that her father had taken the conveyance for the sole benefit and ultimate advantage of her husband. These things must have been known to her, since her husband had always remained in possession of the land, even while the title was in Clark, and she must have been fully apprised of the long and still undetermined litigation between the respondent and her husband, which Blair was endeavoring to practically defeat by placing his property beyond the reach

of the process of the court. We are therefore forced to concur in the judgment of the circuit court, and hold that the several conveyances, from Clark to Wallingford, and from Wallingford to the appellant, were fraudulent and void, as against the respondent in this case.

The relief granted in this case by the circuit court was in strict conformity to the first special relief prayed for in the bill; that is to say, that Gaylord Blair and the appellant, his wife, might be directed by the decree of the court to convey the lands described in the bill, to a receiver to be appointed by the court, and that such receiver might be authorized to sell and convey the lands, and out of the proceeds arising from the sale thereof, to pay the amount of the decree set forth in the bill, with costs, to be invested under the direction of the court, in permanent securities, for the benefit of the respondent, &c. The circuit court in effect so ordered. The power of the circuit court to grant such an order or judgment, was not questioned upon the argument by the counsel for the appellant, but it was contended that it was inequitable to grant so summary a remedy. The circuit court in view of all the circumstances of the case, and especially on account of the fraudulent conduct of Gaylord Blair, saw fit to appoint a receiver to sell the property instead of permitting the respondent to proceed to a sale upon the executions already issued; and we are not prepared to say that this was not a very wise and proper exercise of the discretion of that court in the premises.

Had not Blair resorted to the conveyances mentioned in this discussion, for the purpose of placing his property beyond the reach of any execution which the respondent might issue to enforce her claim, and thus compelled her to file this bill to set aside those conveyances, he might with better grace have insisted that he was entitled to more indulgence and favor from the court. But as it is, we do not think the circuit court erred in depriving him of all benefit of the statute which

gives the debtor two years to redeem after sale on execution.

See *Sands et al. vs. Codwise*, 4. J. R., 536 ; *The Chatauque County Bank vs. White*, 2 Selden, 236, and cases there cited.

We are of the opinion that the order or judgment of the circuit court in this case should be affirmed.